UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
INDIAN CAPITOL DISTRIBUTING, INC.
    Debtor.                                  No. 7-09-11558 SA

CRAIG H. DILL,
    Plaintiff,
v.                                            Adv. No. 11-1061 S

BREWER OIL CO.,
    Defendant.

## MEMORANDUM OPINION IN SUPPORT OF JUDGMENT

Plaintiff/Trustee Dill ("Trustee") filed the complaint seeking recovery of $217,975.86 as preferential transfers and preserving those transfers or their value for the estate. 11 U.S.C. §§547(b), 550 and 551. Doc 1. Defendant Brewer Oil Co. ("Brewer") responded by, among other things, denying the allegations of liability and asserting affirmative defenses of contemporaneous exchange for new value, §547(c)(1), ordinary course of business between itself and Indian Capitol Distributing, Inc. ("Indian Capitol" or "Debtor"), §547(c)(2)(A), ordinary business terms within the industry, §547(c)(2)(B), and subsequent new value §547(c)(4). Amended Answer to Complaint (doc 19). For the reasons set out below, the Court rules that the transfers specified by the Trustee meet the requirements of §547(b) but that all but two of those transfers also fit within the requirements of one of the affirmative defenses pled by

Brewer.  The Court therefore will enter judgment for the Trustee in the principal amount of $20,000.[1]

**BACKGROUND**

Debtor filed its voluntary chapter 11 petition on April 14, 2009.  Prior to filing and for a short time after, the business of Debtor and its owner/manager Michael Mataya was operating several gas station/convenience stores and a bulk plant in the Gallup, New Mexico area.[2]  That business required a steady supply of gasoline and diesel products.

The relationship between Debtor and Brewer started shortly before the filing, in February 2009, when Brewer began selling bulk gasoline and diesel to Indian Capitol.  Previously Brewer

───────────────

[1] The Court has subject matter and personal jurisdiction pursuant to 28 U.S.C. §§1334 and 157(b); this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(F); and these are findings of fact and conclusions of law as may be required by Rule 7052 F.R.B.P.  In addition, as required by the Court, Brewer filed a statement addressing this Court's subject matter jurisdiction to hear and determine the matter at issue.  Brewer's statement recited as follows:
> The undersigned party or parties **consent** to the bankruptcy court hearing <u>and</u> determining all claims and issues in this adversary proceeding and entering final orders and judgments on all claims including money judgments as appropriate, subject to review under 28 U.S.C. § 158.

(Bolding and underlining in original.)

[2] Mr. Mataya separately owned and operated the Mataya Travel Plaza, to which some of the product may have been delivered by Indian Capitol drivers.  Those facts do not alter the analysis or outcome of this decision, since once an Indian Capitol driver had obtained the fuel, Indian Capitol was free to do what it wished with the product.

Case 11-01061-s    Doc 44    Filed 11/30/12    Entered 11/30/12 15:36:53 Page 2 of 43

and Indian Capitol had no relationship, but Brewer agreed to begin selling to Indian Capitol at the request of a Shell Oil representative. Brewer purchases from Shell about 50% of the product (gasoline and diesel) that it sells to its own customers. The Shell representative made the request to Brewer because Indian Capitol's direct purchases from Shell had fallen below the minimum required by Shell for direct purchases from it, and the Shell representative hoped to in effect keep the Indian Capitol business by selling to Brewer as a jobber to Indian Capitol.

Jay Lamberth, whose myriad duties at Brewer included those of the Chief Financial Officer, was responsible for approving the arrangement with Indian Capitol - both the agreement to sell to Indian Capitol and the financial terms. He testified that he never met Michael Mataya, owner and manager of Indian Capitol, but that he reviewed Indian Capitol's credit application. The application lacked a balance sheet and profit and loss statement, and overall the application did not justify "normal" terms; that is, terms that Brewer would ordinarily extend to good credit risks. And a credit report from Experian apparently showed that Indian Capitol was a slow pay.

In consequence, Indian Capitol was put on a "short fuse" for payment, "as close to COD [cash on delivery] as can be". The invoice terms required payment "due on receipt". See Trustee

Page -3-

exhibit 9 ("T-9") and Brewer exhibit 2 ("B-2")[3], which are the Brewer invoices to Indian Capitol.[4]

The payments were to be made by automated clearing house ("ACH") drafts. ACH is a commonly used payment system in the retail fuel distribution industry whereby the seller (Brewer in this instance), with the authorization of the purchaser (Indian Capitol), drafts payment directly from the demand deposit account designated by the purchaser. Upon receiving a bill of lading or document serving a similar purpose, the seller enters the ACH draft into its account at its own bank. Seller's bank's computer system then drafts (collects) the payment from purchaser's bank account (reflected in the purchaser's account as an electronic funds transfer ("EFT")) and deposits the collected funds into seller's account as payment. The ACH transaction is not an immediate payment like a wire transfer,[5] but is an electronic transfer that typically takes two to three days to clear. <u>Cf. In re Gaildeen Indus., Inc.</u>, 71 B.R. 759 (9th Cir. BAP 1987):

_____

[3] Hereinafter the Trustee exhibits are designated as "T-_" and Brewer exhibits as "B-_".

[4] The invoices on their face appear inconsistent, with "DUE ON RECEIPT" at the top and "Terms: NET 30 days from date of invoice" at the bottom. Mr. Lamberthh's testimony was clear that the "due on receipt" language reflected what the deal was.

[5] This testimony from Mr. Lamberth somewhat contradicts his statement that the ACH payment arrangement was as close to COD as possible. Nevertheless, the thrust of Mr. Lamberth's testimony was clear, and the Court found Mr. Lamberth to be a straightforward and credible witness.

> On the basis of the record presented to us, it appears that the sight drafts in this case were identical to checks in their processing and effect: they had a payment function, not a credit function. This is consistent with the record showing that drafts were widely used in the automobile industry, as indicated above.

Id. at 764.  Of course, if there are insufficient funds in the designated purchaser's account, the demand for payment will be refused.

There were approximately 41 purchases of fuel from Brewer by Indian Capitol during a four-week period.  Many of those purchases were paid for immediately by ACH.  The remainder were not and most of those purchases and payments are the basis for the Trustee's complaint.  Attached to this memorandum opinion is a chart showing the challenged payments.[6]

A description of the entire four weeks of transactions provides a picture of the relationship between the parties.

---

[6] The chart shows the details of the deliveries of fuel, the billing and the (non)payments of the specific transactions challenged by the Trustee.  The chart and the Court's recitation of the facts are based in part on Brewer's exhibit "B-1 Revised". B-1 Revised is riddled with errors, so the Court prepared its own chart based on B-1 Revised and on other exhibits admitted into evidence (T-4 through T-7, T-9 and B-2) and on testimony.

The first delivery of fuel, about $15,000 worth[7], was loaded by an Indian Capitol driver on Thursday, February 19, invoiced on the same day, and drafted and paid on Friday, February 20. Another load of fuel, for $15,000, was also delivered (that is, loaded on to an Indian Capitol truck) on February 19, invoiced the same day, drafted on February 20 (a Friday), and paid on February 23.[8] On Friday, February 20, Indian Capitol picked up two more loads, for about $30,000, payment for which was drafted the same day. Then a hiccup occurred; Brewer's draft was rejected the following Monday, February 23. T-7 at 14. However, the next day, Tuesday, February 24, it was honored. T-7 at 15.[9]

Then a larger hiccup occurred (the first entry on the chart). On Monday, February 23, Indian Capitol picked up four

---

[7] With the exception of one load of fuel loaded on March 17, in the amount of $5,648.89, each load of fuel cost somewhere around $13,000 to $16,500. (The lowest figure was $12,521.79 and the highest was $16,807.44.) The clustering of these figures permits the Court to use rough numbers in describing the transactions. The exact figures are in the appended chart.

[8] Unlike with retail banking, at least at the time that these transactions took place no ACH transactions were conducted on weekends.

[9] B-1 Revised erroneously shows this payment having been made when first drafted, on Monday, February 23. The Trustee has not made a claim for this payment. See Exhibit A attached to Plaintiff's Closing Argument (doc 41), which is a photocopy of a flip chart exhibit composed by the Trustee's counsel in the course of the trial itemizing the transactions that the Trustee put at issue. This hand written flip chart exhibit was admitted into evidence. Because Trustee's chart does not include the February 24 payment, it is not included in the Court's chart at the end of this memorandum opinion.

loads of fuel totaling slightly over $57,000.  Brewer drafted the
Indian Capitol account the next day, Tuesday, February 24, but
the draft was rejected the following day, Wednesday, February 25
(T-7 at 16) and returned unpaid on Thursday, February 26 (T-7, at
17).  However (according to B-1 Revised), the "redraft" was sent
Thursday, February 26, and that redraft "cleared" (which on B-1
Revised can also mean "not cleared") on Friday, February 27.  In
fact, what happened was that Indian Capitol wire transferred that
payment to Brewer on February 27.  T-7 at 18.

Another load of fuel was picked up on Wednesday, February
25, drafted on Thursday, February 26, and paid the next day.
Three other loads of fuel were picked up on Thursday, February
26, and on Tuesday, March 3. Brewer drafted Indian Capitol's
account on Wednesday, March 4, for all three loads totaling
approximately $45,000, and the funds were received on Friday,
March 6.

Two loads of fuel were picked up each day for four days,
Wednesday through Saturday, March 4-7, for a total of slightly
over $124,000.  The draft was sent Monday, March 9 (B-1 Revised),
rejected for insufficient funds on Wednesday, March 11 (T-4 at
8), and returned on Friday, March 12 (T-4 at 9).

In the meantime, two loads of fuel totaling $28,000 were
loaded on Monday, March 9, and another for $13,000 the next day,
March 10, all three of which were billed by two ACH drafts on

Page -7-

Tuesday, March 10. Those drafts were rejected on Wednesday, March 11, and then, along with the draft for $124,000, all paid on Thursday, March 12, in a total amount of approximately $166,000. However, the payment was made by wire transfer, T-1 (wire transfer documentation), from Indian Capitol's payroll account[10], leaving that account with a balance of $100.73. T-5 at 2.

That same day (March 12), the draft for over $15,000 of fuel loaded on Tuesday, March 10 and drafted on Wednesday, March 11, cleared. Similarly, two loads of fuel totaling over $31,000 picked up on Wednesday, March 11 and drafted on Thursday, March 12 were paid on Monday, March 16. Two more loads totaling about $31,000 were picked up on Thursday, March 12, drafted on Friday, March 13, and paid on Monday, March 16.

However, on Friday, March 13, Brewer's luck started to worsen. On that day Indian Capitol loaded $13,000 of fuel, and the next day, Saturday, picked up two more loads totaling over $31,500. A payment draft for over $44,500 was issued on Monday, March 16, and dishonored the next day. It was reissued on Friday, March 20, rejected on Monday, March 23, and returned on Tuesday, March 24. It was never paid. In the meantime, on

---

[10] The Trustee testified that Indian Capitol maintained a regular operating account, a payroll account, and a "shell" account with nothing in it that was dormant. Most of the payments to Brewer were made out of the operating account.

Page -8-

Monday, March 16, Indian Capitol picked up two more loads of fuel, totaling about $32,500, which were billed the next day. On Wednesday, March 18, that draft was dishonored and the draft returned on Friday, March 20. Indian Capitol's account was redrafted the same day but that redraft was returned on Tuesday, March 24. It too was never paid.

In the meantime, on Tuesday, March 17, Indian Capitol pulled two more loads totaling almost $22,000, on Wednesday, March 18, two more loads totaling almost $33,00 and on Thursday, March 19, one more load for almost $16,000. Drafts for these loads were sent on the respective following days (March 18-20). The drafts were initially rejected on the following respective business days, but ultimately paid on Friday, March 20, Monday, March 23 and Tuesday, March 24 respectively.

Mr. Lamberth testified that Indian Capitol pulled the March 17-19 loads before Brewer became aware of the returned drafts totaling $77,000 (the $44,500 and the $32,500). Starting Friday, March 27, and then on Tuesday, March 31, and again on Wednesday, April 1, 2009, Brewer began issuing drafts in the amount of $10,000 each (and one for slightly over $7,000), in an effort to trap and collect as much payment as it could.[11] These drafts

---

[11] Mr. Lambert testified that Brewer became aware of the problem March 19 and changed its billing practice then. However, the $10,000 drafts do not show up in Indian Capitol's account records until starting on March 30.

resulted in collections of $10,000 on Monday, March 30 (T-4 at 20) and another $10,000 on Wednesday, April 1 (T-6 at 1).  After that, nothing more was collected from Indian Capitol, and $57,059.77 remained unpaid as of the petition date of April 14, 2009.

**Analysis**

    **Preferential transfer - §547(b):**

    To prevail, the Trustee must first prove all five elements of 11 U.S.C. § 547(b), which provides:

> Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made--
>     (A) on or within 90 days before the date of the filing of the petition; or
>     (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if--
>     (A) the case were a case under chapter 7 of this title;
>     (B) the transfer had not been made; and
>     (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

    Brewer was a creditor.  Section 101(10)(A) defines a creditor as an entity that holds a claim against the debtor. Section 101(5)(A) defines claim as including a right to payment,

Page -10-

whether or not matured.  Brewer had a right to payment for the
fuel delivered to Indian Capitol, and thus was a creditor.

The payments to Brewer were for antecedent debts.  An
"antecedent debt" is a debt "incurred before the allegedly
preferential transfer."  <u>Peltz v. Edward C. Vancil, Inc. (In re
Bridge Info. Sys.)</u>, 474 F.3d 1063, 1066–67 (8th Cir. 2007).  A
debt is "incurred" on "the date upon which the debtor first
becomes legally bound to pay."  <u>Id.</u>  <u>Accord</u>, <u>Velde v. Reinhardt</u>,
366 B.R. 894, 898 n.6 (D. Minn. 2007) (quoting  <u>In re Bridge
Info. Sys.</u>).  <u>See also</u> <u>Skehen v. Bare Bones Graphics (In re
Sweet)</u>, 2009 WL 485136 (Bankr. D. N.M.) *3 ("[A]n antecedent debt
owed by the debtor occurs when a right to payment arises-even if
the claim is not fixed, liquidated, or matured." (Citation and
additional punctuation omitted.)).

> Congress did not define when a debt is incurred.
> However, courts have recognized, in interpreting
> section 547(c)(2), that a debt is incurred when a
> debtor first becomes legally bound to pay. <u>See</u>, <u>e.g.</u>,
> <u>In re Iowa Premium Service Co.</u>, 695 F.2d 1109, 1111
> (8th Cir. 1982) (en banc); <u>Barash v. Public Finance
> Corp.</u>, 658 F.2d 504, 512 (7th Cir.1981).

<u>Bernstein v. RJL Leasing (In re White River Corp.)</u>, 799 F.2d 631,
632 (10th Cir. 1986).

Each fuel delivery created a debt because at that point the
fuel had not been paid for.  Even if Brewer received payment as
soon as it electronically debited Indian Capitol's operating
account, the fuel had already been delivered and the obligation

Page  -11-

incurred, so that the payment was still for an antecedent debt.[12]

The presumption of insolvency for the ninety-day period preceding the filing of the petition, §547(f), went entirely unrebutted (a practical decision by Brewer's experienced counsel not to contest the issue).  While the burden is on the Trustee to establish all elements of his case, 11 U.S.C. § 547(g), the burden is on the preference defendant to rebut the § 547(f) presumption of insolvency.  Lawson v. Ford Motor Co, (In re Roblin Indus., Inc.), 78 F.3d 30, 34 (2nd Cir. 1996); Sapir v. Eli Haddad Corp. (In re Coco), 67 B.R. 365, 371 (Bankr. S.D.N.Y. 1986) ("Even though the ultimate burden of persuasion remains on the party seeking to avoid the transfer, it is incumbent upon the transferee to come forward with some evidence to rebut the presumption."  (Citations omitted.))  See also Sanyo Electric, Inc. v. Taxel (In re World Financial Services Center, Inc.), 78 B.R. 239, 241 (9th Cir. BAP 1987), aff'd, 860 F.2d 1090 (9th Cir.

---

[12] Arguably a precisely contemporaneous exchange of value – for example, handing over the cash with one hand and receiving in the other the item being purchased – would mean there is not really an "antecedent debt", so that there would be no preference to begin with.  Such a scenario could exist in this industry by having the debtor's account being drafted as the fuel is loaded, so that literally there is a completely contemporaneous exchange. But as the Court was told in a similar adversary proceeding, that technology, while theoretically possible, is not currently in use in this industry for whatever reason.  In any event the term "substantially contemporaneous" makes clear that the issue in all these cases is the effect of a payment after (and sometimes before) the debt is incurred.

Page -12-

1988)(a creditor's speculation on debtor's solvency does not overcome the presumption of insolvency).

In addition, the Trustee affirmatively proved that the debtor was insolvent during that period. For example, the Trustee testified that Mr. Mataya had simply retained and not passed on to the State of New Mexico approximately $7 million of fuel taxes. Given the short amount of time that the Debtor operating as a debtor in possession, a very large amount of that was incurred and owed prepetition. The Trustee testified that there would be no payment on non-priority unsecured claims, a claim easily backed up by his statements that upon further investigation, he had added over $1 million in liabilities to what the Debtor had already listed.

The payment records are clear of course that all the deliveries and payments were made within the preference period.

The Trustee testified extensively about what assets he had been able to liquidate for the estate, and summarized their value as far less than the debt owed by the estate as of the date of the filing of the petition.

> [I]t is "generally well settled that unless creditors would receive a 100% payout, any unsecured creditor who receives a payment during the preference period is in a position to receive more than it would have received under a Chapter 7 liquidation." Hoffinger Indus., Inc. v. Bunch (In re Hoffinger Indus., Inc.), 313 B.R. 812, 827 (Bankr. E.D. Ark. 2004) (internal quotation marks and citations omitted); accord Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.), 930 F.2d 458, 465 (6th Cir. 1991); Zachman Homes, Inc. v.

Page -13-

Oredson (In re Zachman Homes, Inc.), 40 B.R. 171, 173 (Bankr. D. Minn. 1984).

Velde v. Reinhardt, 366 B.R. at 898.  The Court finds that there would have been no dividend to unsecured creditors, much less full payment, including to Brewer, if this case were filed as a Chapter 7 initially, Brewer had not received the challenged payments, and the assets of the estate were liquidated and distributed as provided by the Code.

Having met all requirements of Section 547(b), the Court finds the Trustee has made a prima facie case.  The burden now shifts to Defendant to prove an exception to the Trustee's case.  See 11 U.S.C. § 547(g).

**Affirmative defenses:**

Defendant argues that the transfer is not avoidable under sections 547(c)(1), (c)(2) and (c)(4).  These sections provide:

> The trustee may not avoid under this section a transfer--
> (1) to the extent that such transfer was--
>     (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>     (B) in fact a substantially contemporaneous exchange;
> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;, and such transfer was -
>     (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>     (B) made according to ordinary business terms;
> ...;

Case 11-01061-s   Doc 44   Filed 11/30/12   Entered 11/30/12 15:36:53 Page 14 of 43

> (4) to or for the benefit of a creditor, to the extent
> that, after such transfer, such creditor gave new value
> to or for the benefit of the debtor--
>> (A) not secured by an otherwise unavoidable
>> security interest; and
>> (B) on account of which new value the debtor did
>> not make an otherwise unavoidable transfer to or
>> for the benefit of such creditor.

Brewer needs to prove, with respect to each of the preferential transfers, that the transfer in question is protected by at least one of the exceptions. But once it makes a showing that a particular transaction is covered by one exception, it need not invoke any other exception for that transaction.

> Subsection (c) contains exceptions to the trustee's
> avoiding power. If a creditor can qualify under any one
> of the exceptions, then he is protected to that extent.
> If he can qualify under several, he is protected by
> each to the extent that he can qualify under each.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 373-74 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 88 (1978) <u>reprinted in</u> 1978 U.S.C.C.A.N. 5787, 5874, 6329; <u>see also</u> <u>Kupetz v. Elaine Monroe Assoc., Inc. (In re Wolf & Vine)</u>, 825 F.2d 197, 201 (9th Cir. 1987)("Subsection [547](c) contains exceptions to the trustee's avoiding power. If a creditor can qualify under any one of the exceptions, then he is protected to that extent.") Thus, for example, a wire transfer that is substantially contemporaneous according to §547(c)(1) need not also qualify as delivered in the ordinary course of business or financial affairs of the debtor and creditor or according to ordinary business

terms, §547(c)(2)(A) or (B), even if, in order to make the wire transfer, the debtor had to raid its payroll account because the operating account was nearly empty.

### **Contemporaneous Exchange - §547(c)(1)**

In <u>Gonzales v. DPI Food Products Co. (In re Furr's Supermarkets, Inc.)</u>, 296 B.R. 33, 39 (Bankr. D. N.M. 2003), this Court stated the following:

> Section 547(c)(1) protects transfers from attack if (1) the preference defendant extended new value to the debtor, (2) both the defendant and the debtor intended the new value and reciprocal transfer by the debtor to be contemporaneous and (3) the exchange was in fact contemporaneous.
> The purpose of the contemporaneous exchange exception ... is to encourage creditors to continue to deal with troubled debtors without fear that they will have to disgorge payments received for value given. If creditors continue to deal with a troubled debtor, it is possible that bankruptcy will be avoided altogether.
> 5 Alan N. Resnick & Henry J. Sommer, <u>Collier on Bankruptcy</u> ¶ 547.04[1], at 547- 47-48 (15th ed. rev. 2003)(Footnotes omitted.) The parties' intent to make a contemporaneous transfer is an essential element of a section 547(c)(1) defense. <u>Lowrey v. U.P.G. Inc. (In re Robinson Bros. Drilling, Inc.)</u>, 877 F.2d 32, 33 n.1 (10th Cir. 1989). <u>See also</u> <u>Harrah's Tunica Corp. v. Meeks (In re Armstrong)</u>, 291 F.3d 517, 525 (8th Cir. 2002) (the parties' intent is the critical inquiry)(<u>quoting</u> <u>Official Plan Comm. v. Expeditors Int'l of Washington, Inc. (In re Gateway Pacific Corp.)</u>, 153 F.3d 915, 918 (8th Cir. 1998)). The section protects transfers that do not result in diminution of the estate because unsecured creditors are not harmed by the transfer if the estate was replenished by an infusion of assets that are of roughly equal value to those transferred. <u>Manchester v. First Bank & Trust Co. (In re Moses)</u>, 256 B.R. 641, 652 (10th Cir. BAP. 2000).

Similarly, in Official Unsecured Creditors Committee v. Airport Aviation Services, Inc. (In re Arrow Air, Inc.), 940 F.2d 1463, 1465-66 (11th Cir. 1991) the Eleventh Circuit discussed the application of §547(c)(1):

> The contemporaneous-exchange-for-new-value exception is an affirmative defense; so a transferee seeking to rely on it has the burden of establishing all required elements. See Jet Florida, Inc. v. American Airlines, Inc. (In re Jet Florida Systems, Inc.), 861 F.2d 1555, 1558 (11th Cir. 1988). And, as the name of the exception suggests, it has three basic requirements: (1) the transferee must have extended new value to the debtor in exchange for the payment or transfer, (2) the exchange of payment for new value must have been intended by the debtor and transferee to be contemporaneous, and (3) the exchange must have been in fact substantially contemporaneous. See, e.g., Tyler v. Swiss Am. Secs., Inc. (In re Lewellyn & Co., Inc.), 929 F.2d 424 (8th Cir. 1991); 11 U.S.C.A. § 547(c)(1).[13]

There is no question about the value of the payments compared with the value of the product delivered. Neither of the

_____

[13] Compare Jones Truck Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund (In re Jones Truck Lines, Inc.), 130 F.3d 323, 327 (8th Cir. 1997):
> To illustrate, assume that an employer fails to pay an employee's salary and benefits when due. The employee complains and threatens to resign, or his union threatens to strike. If the employer responds by paying (or providing collateral for) the past-due salary or benefits, that transfer is not for new value. See In re Elton Trucking, Inc., 1996 WL 261059 (Bankr. N.D. Ill. 1996); In re Burner Servs. & Combustion Controls Co., 1989 WL 126487 (Bankr. D. Minn. 1989). If the employer also resumes paying the employee's current salary and benefits when due, and the employee keeps working, those current payments are contemporaneous exchanges for "new value," the employee's continuing services.

(Footnote omitted.)

parties suggested that what Indian Capitol was billed was anything other than what Shell Oil (through Western Refining) was charging everyone else.

Nor is there any real question of the parties' shared intent concerning when payment was due and to be made. The evidence of what the "agreement" or "intent" of the parties was is derived from Mr. Lamberth's testimony and the history of the transactions. Mr. Mataya did not testify, and the Trustee candidly testified that he did not know what the agreement between the parties was. Nevertheless, the Court is comfortable in presuming what the parties' joint "intent" was. There would never have been any sales to Indian Capitol had close-to-COD terms not been in place, and Indian Capitol's "agreement" to those terms can be presumed from its purchases of fuel from Brewer and its attempt to meet (and occasional success in meeting) the payment terms, particularly when it was failing to pay other suppliers during the same time period on whom it also relied to obtain product. See exhibits T-4 and T-7.

And this is true even though in fact a number of payments were not made exactly as required by Brewer. A variety of cases allow the defense when the transfer took place days and weeks after the initial advance of value. See, e.g., Peters v. Wray State Bank (In re Kerst), 347 B.R. 418, 424-27 (Bankr. D. Colo. 2006) (47 days from date of loan to perfection of lender's

interest in the collateral, a motor vehicle; parties did not cause the delay in attempting to implement the intent of the parties to immediately secure the loan with a lien on the vehicle) and In re Gaildeen Indus., Inc., 71 B.R. at 765-66 (sight drafts presented three days after sale; parties not responsible for the bank's delay in processing them for payment). As Collier puts it, "[t]he question is one of intent and although a delay between the incurrence of the debt and its payment can evidence that the exchange was not intended to be contemporaneous, the passage of time does not necessarily negate that intent".  5 Collier on Bankruptcy ¶547.04[1][a] (Alan J. Resnick & Henry J. Sommers, eds., 16th ed. 2012) ("Collier"), citing Hechinger Investment Company of Delaware, Inc. v. Universal Forest Products, Inc. (In re Hechinger Investment Company of Delaware, Inc.), 489 F.3d 568 (3d Cir. 2007) and Silverman Consulting, Inc. v. Canfor Wood Products Marketing (In re Payless Cashways, Inc.), 306 B.R. 243 (8th Cir. BAP 2004), aff'd 394 F.3d 1082 (8th Cir. 2005).

There is a question, however, about whether the delayed payments were "in fact substantially contemporaneous".  Arrow Air, Inc., 940 F.2d at 1466.  "Intention that an exchange be contemporaneous is not relevant to a court's determination whether the exchange is in fact contemporaneous".  5 Collier ¶547.04[1][b].  See Kerst, 347 B.R. at 426 n. 14 (analyzing

§547(c)(1)(A) separately from §547(c)(1)(B) to avoid the circular reasoning of some courts that the fact that the transaction was intended to be contemporaneous meant that it was contemporaneous).

There are a number of cases that hold that a dishonored check (or, in this case, ACH transaction) converts the transaction from a contemporaneous exchange of value to a credit transaction, thereby depriving the creditor of the affirmative defense. See <u>Endo Steel, Inc. v. Janas (In re JWJ Contracting Co.)</u>, 371 F.3d 1079, 1082 (9th Cir. 2004):

> [B]ecause Endo had given JWJ an unconditional release of the bond claim in exchange for what turned out to be an NSF check, the subsequent payment that replaced the NSF check was given in exchange for what had become an unsecured debt, and did not result in a contemporaneous exchange for new value.

(citing <u>Morrison v. Champion Credit Corp. (In re Barefoot)</u>, 952 F.2d 795 (4th Cir. 1991)); <u>Stewart v. Barry County Livestock Auction, Inc. (In re Stewart)</u>, 274 B.R. 503, 512 (Bankr. W.D. Ark. 2002), <u>aff'd</u>, 282 B.R. 871 (8th Cir. BAP 2003) (holding that bounced personal checks replaced by cashier's checks precluded resort to substantially contemporaneous defense); <u>In re Barefoot</u>, 952 F.2d 795, 800 (4th Cir. 1991) (purpose of the transfer was to make good a check of the debtor that had bounced prior to the ninety-day period); <u>In re Gaildeen Indus., Inc.</u>, 71 B.R. at 764:

> Because the sight draft appears to be the practical and legal equivalent of a check in this case, the law applicable to checks and cash equivalents in Section

> 547(a)(1) cases would also apply here. Section
> 547(a)(1) protects transfers involving payment by check
> as contemporaneous exchanges—the only exception being
> if a check is dishonored by a bank upon its
> presentation; such dishonor transforms the transaction
> into a credit transaction. <u>In re Standard Food
> Services, Inc.</u>, 723 F.2d 820, 821 (11th Cir.1984).

; <u>Goger v. Cudahy Foods Co. (In re Standard Food Servs., Inc.)</u>,

723 F.2d 820, 821 (11th Cir. 1984):

> Contrary to language contained in the House report,
> payment of a debt by means of a check is equivalent to
> a cash payment unless the check is dishonored. Payment
> is considered to be made when the check is delivered
> for purposes of sections 547(c)(1) and (2). 124
> Cong.Rec. H11,097 (daily ed. Sept. 28, 1978); 124
> Cong.Rec. S17, 414 (daily ed. Oct. 6, 1978) (both
> versions using identical language) (emphasis added).
> Thus, the legislative history indicates that, when the
> check bounced, the transaction became a credit
> transaction. When Cudahy received the cashier's check
> on July 8, the check satisfied the preexisting debt and
> therefore was not a contemporaneous exchange for new
> value. <u>See</u> <u>In re Wadsworth Bldg. Components, Inc.</u>, 10
> B.R. 662 (Bkrtcy. D. Idaho 1981).)

; <u>Newton v. Andrews Distributing Company (In re White)</u>, 64 B.R.

843, 847 (Bankr. E.D. Tenn. 1986) ("This court held that, for

purposes of the contemporaneous exchange exception, a check is

payment when it is received, unless it is dishonored. <u>In re</u>

<u>Johnson</u>, 25 B.R. 889 (Bankr. E.D. Tenn. 1982).").  As elaborated

in <u>Barefoot</u>:

> The exception for a contemporaneous exchange does not
> ordinarily apply to credit transactions, and the
> dishonor of a check inevitably creates an antecedent
> debt owed by the debtor which any subsequent payments
> to make good the check, no matter how quickly made,
> would be satisfying. Unlike the case of an honored
> check or a cash payment where there is only one
> exchange between the debtor and creditor, the case of a

Page -21-

dishonored check involves multiple exchanges and thus
assumes the character of a credit transaction: the
debtor gives the bad check, which in this context is
the functional equivalent of a promissory note,
followed by one or more payments to make good the
check. The dishonor of a check, therefore, defeats the
actual achievement of a contemporaneous exchange for
new value, and we conclude that any payments to make
good a bounced check cannot qualify as transfers to
which the contemporaneous exchange exception applies.

<u>Barefoot</u>, 952 F.2d at 800.

Not all courts agree that a dishonored check automatically

deprives the transaction of its contemporaneity. For example, in

<u>Velde v. Reinhardt</u>, 366 B.R. at 900-01, the court sustained

"contemporaneous exchange" defenses when the debtor's checks to

farmers to pay for grain bounced and then were reissued during

the preference period. The respective farmers endorsed the

subsequently issued valid checks over to the banks that had liens

on the grain being paid for, and the banks then released their

liens on the grain being paid for. In the <u>Velde</u> court's view,

the release of the liens constituted the new value for the

debtor.

[I]t was only after [debtor] issued the replacement
checks that the banks' security interests were
released, and it was those releases that constituted
the "new value" received by him. Thus, the necessary
contemporaneousness between the transfers (the
replacement checks) and the new value (the banks'
releases of their liens) exists here.

<u>Id.</u> at 901.[14]

_____

[14] Whether the <u>Velde</u> court's analysis is valid or not - <u>cf.</u>
(continued...)

Page -22-

In a similar vein, <u>In re Philip Services Corp.</u>, 359 B.R. 616
(Bankr. S.D. Tex. 2006), concerned a prepetition debtor tendering
a check to the subcontractor/creditor holding a lien on the
project and project payments.  The creditor accepted the check
and released its lien rights conditioned on the check being
honored.  The next day the check was not honored, due to
insufficient funds.  So that same day debtor wire transferred the
funds to the creditor, which then released its lien.  The court
ruled that the transaction, including for the debtor the receipt
of the value occasioned by the release of the lien, were
substantially contemporaneous.  <u>Id.</u> at 633-34.  As with <u>Velde</u>,
<u>Philips Service</u> differs from the instant case in that Indian
Capitol received no new value once it loaded the fuel.[15]

_____

[14](...continued)
<u>Endo Steel</u>, 371 F.3d at 1082 (lien unconditionally released when
the first (dishonored) check was tendered – the fact is that the
instant facts differ significantly from those in <u>Velde</u>, in that
once Indian Capitol loaded the fuel, it received nothing further
of value.

[15] Because no release of liens was involved, and because
there is no dispute about the value of the fuel compared with
what Indian Capitol was paying, the Court need not consider
<u>Kenan v. Fort Worth Pipe Company, (In re George Rodman, Inc.)</u>,
792 F.2d 125, 128 (10th Cir. 1986) ("The plain language of the
definition [§547(a)(2)] does not require the valuation of the
property transferred [in a §547(c)(1) transaction]."; trial court
erred in valuing released lien retrospectively at time of
initiation of adversary proceeding) and <u>Lowrey v. U.P.G., Inc.
(In re Robinson Bros. Drilling, Inc.)</u>, 877 F.2d 32, 34 (10th Cir.
1989) ("Section 547(c)(1) protects transfers only 'to the extent'
the transfer was a contemporaneous exchange for new value. A
court must measure the value given to the creditor and the new
(continued...)

Case 11-01061-s   Doc 44   Filed 11/30/12   Entered 11/30/12 15:36:53 Page 23 of 43

On the other hand, <u>Philips Services</u> is not helpful to the Trustee. The debtor in <u>Philips Services</u> had a complex financing arrangement involving lockboxes, accounts swept nightly, multiple lending entities, etc. <u>Id.</u> at 623. The debtor delivered a check for $936,741.35 to the creditor, whose president the next morning presented the check for payment at debtor's bank in person. It appears that at that moment the usual balance transfer to cover that day's checks had not taken place, so that the bank did not honor the check. <u>Id.</u> at 621. The creditor's president called the debtor and was told by debtor to present the check again at the bank. He refused to do so, threatening instead to travel to Houston where debtor's headquarters were located.[16] Debtor then wire-transferred the funds to creditor.[17] <u>Id.</u> The <u>Philips Services</u> court made clear that the intent of the parties was for the check to be immediately payable (although debtor may have assumed that the check might not be negotiated for an additional day (or hour) or two), and the result of the transaction was to

_____

[15](...continued)
value given to the debtor in determining the extent to which the trustee may void a contemporaneous exchange."; trial court erred in not valuing the property received by the debtor), citing <u>Jet Florida, Inc. v. American Airlines, Inc. (In re Jet Florida Sys., Inc.)</u>, 861 F.2d 1555, 1558-59 (11th Cir. 1988).

[16] The opinion does not say what creditor's president intended to do upon arrival at debtor's headquarters.

[17] Whether such a procedure, including a personal visit from the creditor's president, would fit the "ordinary business terms" standard of §547(c)(2)(B) is irrelevant at this point.

Page -24-

implement what the parties had intended. In the instant case, the agreement was clear: Brewer would receive payment no later than the next business day for any electronic draft it submitted on Indian Capitol's account. In effect, that is what happened: as an example, Brewer received payment of $165,997.80 on the day that the drafts were supposed to be honored but were not, albeit the payment was by wire transfer rather than by an ACH transfer. The prime consideration is when the funds were received (consistent with the parties' joint intention) rather than the specific medium of payment. In this sense what happened with this payment is consistent with what happened in Philips Services.

The Barefoot analysis and result seem to assume that in effect the transaction has been a simultaneous (rather than substantially contemporaneous) exchange of value (product paid for by check at the time of delivery of the product). Otherwise how could the transaction suddenly became a "credit" transaction when the check bounced? If a court is dealing with §547(c)(1), then the transaction by definition will be a credit transaction, since §547(c)(1) arises only in response to the trustee having proved that the debtor made a payment on an antecedent debt. §547(b)(2). "The defendant transferee need not prove that it falls within one of these statutory exceptions [§547( c)], however, if the trustee fails to prove all of the elements of a

Case 11-01061-s   Doc 44   Filed 11/30/12   Entered 11/30/12 15:36:53 Page 25 of 43

preference set out in section 547(b)."  5 <u>Collier</u> ¶547.04, citing

<u>Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)</u>, 14 B.R. 293,

306 (M.D. Tenn. 1981), <u>aff'd in part and vacated and remanded in</u>

<u>part on other grounds</u>, 706 F.2d 171 (6th Cir. 1983), <u>cert.</u>

<u>denied</u>, 464 U.S. 935 (1983).  So to declare that a bounced check

creates a "credit" transaction diverts from the real issue at

hand, which literally is whether the payment was made

substantially contemporaneously with the delivery of the product

(and if the parties so intended).

Second, focusing on whether a check bounces as the standard

by which contemporaneity is measured confuses the timeliness of

the payment (which, after all, is the heart of the defense, along

with intention) with the mechanism or mode of payment.  How the

payment is made is only relevant to the extent it impacts

contemporaneity.

Third, it is certainly true that the goal of any number of

the transactions examined under this statute arise when the

parties attempt to make the payments effectively COD.  <u>E.g.</u>,

<u>Payless Cashways</u>, 306 B.R. at 253-55 (lumber shipped F.O.B. to

Debtor's facility with payment required before arrival meant that

debtor could only take title to lumber after it paid and after

the lumber arrived).[18]  As Mr. Lamberth testified, it was

_____

    [18] In fact, the <u>Payless Cashways</u> facts would seem to be a
perfect example of the transaction not even constituting a
                                              (continued...)

Case 11-01061-s   Doc 44   Filed 11/30/12   Entered 11/30/12 15:36:53 Page 26 of 43

certainly the intent of the parties in the instant adversary

proceeding to have the transaction be COD as much as possible.

But unless the debtor is on a prepay or literal COD basis, there

will inevitably be some lag between incursion of the debt and

payment.[19]  This will be so even if the check does not bounce.

---

[18](...continued)
preferential transfer, since debtor made the payments before they
were even due; that is, creditor retained title until the lumber
arrived at the debtor's location, by which time debtor had
already paid.  In the instant case, on the other hand, Indian
Capitol had always taken delivery of the fuel, and thus incurred
the debt, before any payment was made.

[19] Congress designed §547(c)(1) and (2) to avoid the need to
determine the niceties of (or even define) antecedency.  <u>See</u>
James J. White, Robert S. Summers and Robert A. Hillman, 4 White,
Summers & Hillman, Uniform Commercial Code §32-5 (6th ed., last
revised October 2012):
> Presumably if the creditor gave new value concurrent
> with the transfer in the form of money or the release
> of property, the transfer is not on account of
> antecedent debt. Unfortunately, the definition of new
> value does not touch upon the question how much time
> can pass between the incurring of the debt and the
> transfer without the debt's being antecedent. By means
> other than defining antecedency, the drafters have
> minimized the problems that otherwise would be
> presented. First, as indicated above, they have allowed
> a thirty-day grace period for perfection and so have
> removed the antecedency question for any secured
> creditor who perfects within 30 days of the creation of
> security interest. Second, by subsections 547(c)(1) and
> (2) the drafters have legitimized certain close at hand
> and ordinary course transactions that would otherwise
> be subject to attack under section 547(b).

(Footnote omitted.)  <u>See also</u> Note, "Timing of Payments by Check
under Section 547 of the Bankruptcy Code," 7 Cardozo Law Review
No. 3, pp. 893-94 (Spring 1986):
> This exception was designed to protect transfers made
> by ordinary checks which are deposited and honored in
> the normal course of business affairs—within thirty
>                                               (continued...)

Page -27-

Finally, <u>Barefoot</u> and other cases cite the legislative history to suggest that Congress intended a contemporaneous transaction to conclude with an honored check but that a dishonored check deprives the creditor of the §547(c)(1) defense.[20] Even assuming for the sake of argument that that reading of the legislative history is accurate, the phrase "substantially contemporaneous" connotes a temporal reference.

> The focus of the "in fact" prong of the [§ 547(c)(1) analysis] is obviously on the temporal proximity between the issuance of credit and transfer of assets to secure that credit. However, the modifier "substantial" makes clear that contemporaneity is a flexible concept which requires a case-by-case inquiry into all relevant circumstances (e.g., length of delay, reason for delay, nature of the transaction, intentions

---

[19](...continued)
days of delivery ... This exception thus protects transfers that are not intended to be—but are technically—on account of antecedent debt.

[20] The entirety of the minimal legislative history on §547(c)(1) is as follows:
> The first exception is for a transfer that was intended by all parties to be a contemporaneous exchange for new value, and was in fact substantially contemporaneous. Normally, a check is a credit transaction. However, for the purposes of this paragraph, a transfer involving a check is considered to be "intended to be contemporaneous", and if the check is presented for payment in the normal course of affairs, which the Uniform Commercial Code specifies as 30 days, U.C.C. § 3-503(2)(a), that will amount to a transfer that is "in fact substantially contemporaneous."

H.R. Rep. No. 595, 95th Cong., 1st Sess. 373 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 5963, 6329.
The <u>Standard Food Services</u> case disagrees with the statement that the issuance of a check creates a "credit" transaction rather than a "cash' transaction. <u>Id.</u>, 723 F.2d at 821. Under this Court's analysis, the wording makes no difference.

Case 11-01061-s   Doc 44   Filed 11/30/12   Entered 11/30/12 15:36:53 Page 28 of 43

of the parties, possible risk of fraud) surrounding the allegedly preferential transfer.

Pine Top Insurance Co. v. Bank of America National Trust and Savings Assoc., 969 F.2d 321, 328 (7th Cir.1992) (footnote omitted).

The Supreme Court on numerous occasions has ruled that words in a statute are to be given their common everyday meaning. See Microsoft Corp. v. i4i Ltd. Partnership, ___ U.S. ___, 131 S.Ct. 2238, 2245 (2011):

> We begin, of course, with "the assumption that the ordinary meaning of the language" chosen by Congress "accurately expresses the legislative purpose." Engine Mfrs. Assn. v. South Coast Air Quality Management Dist., 541 U.S. 246, 252, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004) (internal quotation marks omitted).

; Hamilton v. Lanning, ___ U.S. ___, 130 S.Ct. 2464, 2471 (2010) ("When terms used in a statute are undefined, we give them their ordinary meaning.")(quoting Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995).; Estep v. United States, 327 U.S. 114, 136 (1946)("These words [in the Selective Service Act] can only mean what they appear to mean if they are read as ordinary words should be read. Ordinary words should be read with their common, everyday meaning when they serve as directions for ordinary people.") It has also ruled that if the meaning of the statute is clear, that is the end of the inquiry, e.g., Zuni Public School Dist. No. 89 v. Dept. of Education, 550 U.S. 81, 93 (2007)("Under this Court's precedents, if the intent of Congress

is clear and unambiguously expressed by the statutory language at
issue, that would be the end of our analysis.")(Citation
omitted.); <u>Hartford Underwriters Ins. Co. v. Union Planters Bank,
N.A.</u>, 530 U.S. 1, 6 (2000)(Citations omitted.), and no further
search for meaning is needed, including resort to legislative
history, <u>see</u> <u>Toibb v. Radloff</u>, 501 U.S. 157, 162 (1991):

> First, this Court has repeated with some
> frequency: "Where, as here, the resolution of a
> question of federal law turns on a statute and the
> intention of Congress, we look first to the statutory
> language and then to the legislative history if the
> statutory language is unclear." <u>Blum v. Stenson</u>, 465
> U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891
> (1984). The language of § 109 is not unclear. Thus,
> although a court appropriately may refer to a statute's
> legislative history to resolve statutory ambiguity,
> there is no need to do so here.

This Court is hesitant to adopt a rather inflexible and
uncalled-for test that requires that any dishonored check or ACH
transaction automatically takes the transaction out of the
"contemporaneous exchange" category, even when, for example, the
missed payment is made up the same day that it was due (albeit by
another mechanism).[21]

---

[21] To be clear, in <u>Barefoot</u> and the other cited cases, the
missed payment was not made up the same day. <u>E.g.</u>, <u>Endo Steel</u>,
371 F.3d at 1081, 1083 (JWJ gave Endo a check on April 14, 1994,
which issued an unconditional release. The check was dishonored
for insufficient funds. JWJ delivered a replacement cashier's
check on May 2, 1994, within 90 days of filing a Chapter 11.
Citing <u>Barefoot</u>, the Ninth Circuit concluded that the transaction
was a credit transaction and the April 14 release was not
contemporaneous with the May 2 payment. Therefore, the Trustee
could recover the payment.)

Applying the foregoing analysis to the transactions between these two parties, the Court finds that the majority of the transactions survive the Trustee's challenge.  Virtually all of them fit within the "substantially contemporaneous" defense.

To reiterate, the clear intent of the parties was that payment would be made right away upon drafting the Indian Capitol (operating) account; that is, a draft electronically sent one day would result in payment on the next business day.  It is clear that Indian Capitol certainly needed the fuel, and it is even more apparent that Brewer, taking on this customer, a poor credit risk, at the behest of an important refiner/vendor, was initiating a significant new credit relationship that had, as the parties clearly could foresee, a considerable downside.[22]  Thus the requirement for immediate payment was an integral part of the parties' agreement and intent.  See Payless Cashways, 306 B.R. at 250 (debtor needed the lumber and creditor needed assurances of payment, so debtor agreed to payments by EFT although that method was burdensome to debtor).  And the ACH process would be the standard method of accomplishing that goal, rather than the more labor intensive (albeit faster) method of demanding and receiving a wire transfer.  But when the ACH process did not result in

---

[22] For example, as noted above, Indian Capitol had pulled five more loads of fuel, worth approximately $71,000, on March 17, 18 and 19 (transactions 10 - 12 on the chart), before Brewer became aware of the payment default on the immediately preceding purchases totaling $77,000.

Case 11-01061-s   Doc 44   Filed 11/30/12   Entered 11/30/12 15:36:53 Page 31 of 43

payment, there was nothing in the parties' agreement that
precluded resort to a wire transfer.

As the chart shows, transactions 1 through 12 resulted in
payments within, respectively, 3, 3, 2, 2, 2, 4 (includes a
weekend), 4 (weekend), unpaid, unpaid, 2, 4 (weekend), and 4
(weekend) days. Acknowledging that each "substantially
contemporaneous" dispute requires a case-by-case examination of
the details, <u>Kerst</u>, 347 B.R. at 426, it is nevertheless hard to
argue that payment times of two to four days following billing
are not substantially contemporaneous, at least in this context.
<u>See</u> <u>id.</u> at 427 ("Nine days is considered substantially
contemporaneous under even the most rigid bright-line test.").[23]

_____

[23] In a similar adversary proceeding under this case, <u>Dill
v. Brad Hall & Assoc.</u>, 2012 WL 3292891 (Bankr. D. N.M.), this
Court found that payments within eight days and eleven (including
a weekend) days were substantially contemporaneous. <u>Id.</u> at *3.
And in <u>Dean v. Davis</u>, 242 U.S. 438 (1917), which §547(c)(1) is
considered to have more or less codified, the Supreme Court was
faced with the following facts:

> R. Crawley Jones was a farmer and owner of a country
> store. A bank, having discounted his notes bearing
> indorsements which it later concluded had been forged,
> demanded that Jones take up the notes. Fearing arrest,
> he appealed through his father to his brother-in-law,
> Dean, for a loan of $1,600, promising to secure it by a
> mortgage of all his property, which he represented was
> worth more than five times that amount. Dean provided
> the money, and on September 3, 1909, acting in
> conjunction with Jones's father, 'took up' the notes.
> Most of them were not yet due. A mortgage deed of trust
> dated September 3 was executed September 10, and
> recorded September 11. It covered practically all of
> Jones's property, including the stock in trade and
> accounts, store furnishings and fixtures, household
>                                        (continued...)

It is true that the eight loads represented by transaction 2 in the chart were picked up, at the rate of two loads per day, from Wednesday, March 4 through Saturday, March 7, and all billed together on Monday, March 9. Although there was no testimony on the timing of this specific transaction (or four or eight transactions), it seems consistent with the parties' mutual intent, in that Indian Capitol would probably be happy with any delay in billing, that it would be in Brewer's discretion about when to bill, and that in any event the bill was paid within three days of billing. And the fact that transactions 2, 3 and 4 were paid with a cashier's check itself paid for with the contents of the payroll account does not mean that the payment for those sales does not meet the requirements of §547(c)(1). As

---

[23](...continued)
furniture and goods, live stock, crops standing and cut, and the farm itself, the last subject to a prior deed of trust. Four mortgage notes were given, payable respectively in seven, thirty, sixty, and ninety <u>days</u>; with a proviso that upon default on any one all should become payable. The first note-and hence all-was overdue when the mortgage was recorded. On that day Dean directed that possession of the property be taken, which was done on September 13 (the 12th being Sunday). Jones was at the time deeply insolvent and had many unsecured creditors.

<u>Id.</u> at 442 (emphasis added). Nevertheless, the court ruled that the transaction was not subject to avoidance:
The mortgage was not voidable as a preference under § 60b. Preference implies paying or securing a pre-existing debt of the person preferred. The mortgage was given to secure Dean for a substantially contemporary advance. The bank, not Dean, was preferred.

<u>Id.</u> at 443.

Page -33-

with <u>Philips Services</u>, at its most basic level, the payment was made literally "substantially contemporaneously" and consistent with the parties' intentions.[24]  And of course the estate was not diminished.  The Court therefore concludes that these three transactions which did not result in honoring immediately the EFT but did result in payment that day by wire transfer qualify for §547(c)(1) protection.

That leaves two other payments, each for $10,000, drafted from Indian Capitol's account on March 30 and April 1 respectively.  These payments came about because the two larger drafts (transactions 8 and 9 on the chart) were never honored, despite being submitted twice for payment (and returned each time).  At the same time Indian Capitol was no longer returning phone calls from Brewer, so Brewer broke the drafts down into eight smaller drafts, seven for $10,000 each and one for $7,059.77, for a total of $77,059.77.  Brewer then began sending these drafts repeatedly in the hopes of trapping smaller amounts of cash to collect as much as possible.  Aside from the fact that the original drafts were submitted on March 16 and 17 respectively, so that the collection took place about two weeks

_____

[24] That the payment was drawn from the payroll account, and thus certainly not within "ordinary business terms", §547(c)(2)(B), and in fact not within the ordinary course of business or financial affairs between debtor and creditor, §547(c)(2)(A), is of course irrelevant for this specific inquiry under §547(c)(1).

Case 11-01061-s   Doc 44   Filed 11/30/12   Entered 11/30/12 15:36:53 Page 34 of 43

later (and thus might no longer be considered "substantially contemporaneous"), it appears that the parties no longer shared the intention to ensure payment substantially contemporaneously.

> In dealing with transactions of this kind we may go far in giving them any form that will carry out the mutually understood intent.  <u>Sexton v. Kessler & Co.</u> 225 U. S. 90, 96, 97, 56 L. ed. 995, 999, 1000, 32 Sup. Ct. Rep. 657.  But if the intent was doubtful or inconsistent with the legal effect of dominant facts, it must fail.

<u>National City Bank of New York v. Hotchkiss</u>, 231 U.S. 50, 56 (1913) (commonly cited as the judicial precedent for §547(c)(1)(B)).  That is, Indian Capitol's refusing to return phone calls, and also apparently refusing to make deposits timely enough to cover Brewer's drafts[25], can only mean that Indian Capitol was no longer intent on quickly covering those drafts. In addition, Mr. Lamberth testified that beginning on March 19, Brewer changed its billing practice with Indian Capitol (by breaking the drafts into smaller increments).  There was no testimony that Indian Capitol agreed with this change; indeed, Mr. Lamberth's testimony was that the change came about in part because there was now no communication at all from Indian Capitol.  In consequence, with no mutual intent to have Brewer

---

[25] T-7 and T-4 show several instances of substantial deposits being made into the operating account shortly before the arrival of a Brewer draft, even when other suppliers' drafts and checks were being rejected.  Indeed, Brewer's counsel seemed to make this very point in his cross examination of the Trustee when he asked the Trustee if he had noticed that pattern.

paid substantially contemporaneously, those two payments cannot
qualify for §547(c)(1) protection.

Given this conclusion, the Court must therefore consider
whether the $20,000 is protected from avoidance and recovery
pursuant to any of the other affirmative defenses asserted by
Brewer.  Each of the remaining affirmative defenses is easily
disposed of.

### Ordinary course of business or financial affairs of the debtor and the transferee - §547(c)(2)(A)

The facts of this case are a bit atypical.  Ordinarily there
is a history of dealings between the debtor and the creditor that
extends backward beyond the preference period, allowing a
comparison of the behavior of the parties during the preference
period both with their behavior beforehand (and with industry
standards).  5 Collier ¶547.04[2][a][ii] ("The defendant must
establish a 'baseline of dealing' so that the court may compare
the transfers made during the preference period with the parties'
prior course of dealings." Footnote omitted.).  In the instant
case, the only relationship between Indian Capitol and Brewer
took place for a brief period during the 90 days immediately
preceding the filing of the bankruptcy petition.  However, that
lack of history does not preclude the application of §547(c)(2)
to the facts of this case.  See Sender v. Nancy Elizabeth R.
Heggland Family Trust (In re Hedged-Investments Associates,
Inc.), 48 F.3d 470 (10th Cir. 1995) (only payment made to

creditor was a single payment during the preference period; court nevertheless considered and overruled §547(c)(2) defense).

In the instant case, as noted above, the dominant relationship between the two parties was that Indian Capitol would obtain fuel and then promptly pay for it by ACH draft and occasionally by wire transfer. At the very end of the relationship, however, Brewer resorted to breaking its billing down into smaller, $10,000 increments in order to capture what funds Debtor did have. It is obvious that the collection pattern for the $20,000 did not fit what had preceded it. In consequence, the Court easily finds that Brewer has not met the standards of §547(c)(2)(A) to protect the $20,000 it received on March 30 and April 1.

**Ordinary business terms - §547(c)(2)(B)**

In <u>Clark v. Balcor Real Estate Finance, Inc. (In re Meridith Hoffman Partners)</u>, 12 F.3d 1549 (10th Cir. 1993), the Tenth Circuit enunciated the test for a transaction to conform to the "ordinary business terms" standard of §547(c)(2)(B):

> Ordinary business terms therefore are those used in "normal financing relations": the kinds of terms that creditors and debtors use in ordinary circumstances, when debtors are healthy. Such terms do not raise the dangers that the preference section seeks to avoid.

<u>Id.</u> at 1553. It is beyond cavil that breaking a billing down into smaller increments in order to repeatedly draft the debtor's operating account in an attempt to trap at least some payment is

Case 11-01061-s    Doc 44    Filed 11/30/12    Entered 11/30/12 15:36:53 Page 37 of 43

not what parties do when the debtor is financially healthy. Brewer's assertion of the ordinary business terms defense under §547(c)(2)(B) fails.

### Subsequent new value - §547(c)(4)

The "subsequent new value" defense requires in part that the creditor provide to the debtor "new value", defined in section 547(a)(2) as follows:

> "[N]ew value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

In this instance the new value delivered was the product, worth ($77,059.77 - $20,000 =) $57,059.77, which Indian Capitol loaded on Monday and Tuesday, March 16 and 17. That was real value unquestionably delivered on those days.

The purpose of the section 547(c)(4) defense is generally thought to advance two bankruptcy policies.

> First, it encourages creditors to do business with financially troubled debtors. A creditor will be more likely to continue to advance new value to a debtor if all these subsequent advances may be used to offset a prior preference. If a second advance of new value carries no benefit, the creditor will be unlikely to make it. Second, this approach recognizes the fluid nature of ongoing commercial activity where a creditor looks to a debtor's entire repayment history, instead of one isolated transaction, to decide whether to advance new credit.

<u>Mosier v. Ever-Fresh Food Co. (In re IRFM, Inc.)</u>, 52 F.3d 228, 232 (9th Cir. 1995) (citation omitted).  Section 547(c)(4) is finely tuned to protect those creditors who, after receiving a preference, in effect return the preference to the estate by providing new value to the debtor.  The relevant inquiry is whether that new value replenishes the estate.  If the debtor pays for that new value the estate is not replenished and the preference unfairly benefits the creditor.  <u>Kroh Bros. Development Co. v. Continental Construction Engineers, Inc. (In re Kroh Bros. Development Co.)</u>, 930 F.2d 648, 652 (8th Cir. 1991).

The policy reasons described in the indented paragraph above are largely inapplicable to these two parties.  In allowing Indian Capitol to pick up all that product on March 16 and 17, Brewer had no idea it was not going to get paid.  Indeed, it is unlikely that anyone was motivated by, or even aware of, the policies behind the statute.

More to the point, as to the two transactions that went unpaid (transactions 8 and 9), it is clear, certainly in retrospect (see the chart), that every payment preceding those two was a transfer that could not be avoided because the parties were contemporaneously exchanging full value.  That is, by end of transaction 7, neither party owed the other one anything.  (Some of the preceding transfers the Trustee did not even attempt to

Case 11-01061-s   Doc 44   Filed 11/30/12   Entered 11/30/12 15:36:53 Page 39 of 43

avoid.)  In consequence, there were no previous payments to
Brewer from Indian Capitol that Indian Capitol had not received
full value for.  <u>See</u> §547(c)(4) ("the trustee may not avoid under
this section a transfer – to or for the benefit of a creditor, to
the extent that, <u>after</u> such transfer, such creditor gave new
value....") (emphasis added).  That is, there were no existing
(otherwise unavoidable) preferences to which the new value could
be applied.  And as the wording of the statute makes clear, any
excess of new value over prior preferential payments cannot be
carried forward to offset future preferential payments.  It is a
"subsequent new value" defense, not "subsequent new payment"
defense.  And of course there was no new value given after the
collection of the $20,000 in late March and early April.  So the
Trustee is entitled to avoid and recover for the estate those two
$10,000 payments.

**Interest**

The Trustee has not asked for prejudgment interest in his
complaint.  Doc 1.  In consequence the Court will not award it.
The Court will of course award post-judgment interest at the
federal rate.

**Conclusion**

The Trustee has shown that the estate is entitled to avoid
and recover for the estate $20,000 in preferential transfers for
which no defense is available.  The Court will therefore enter

Case 11-01061-s   Doc 44   Filed 11/30/12   Entered 11/30/12 15:36:53 Page 40 of 43

judgment for the Trustee in that amount, together with post-

judgment interest at the federal rate.

_Jame S Starzynski_

Honorable James S. Starzynski
United States Bankruptcy Judge

Date entered on docket: November 30, 2012

Copies to:

James A Askew
Attorney for Plaintiff
Arland & Associates, LLC
201 3rd ST NW, STE 505
Albuquerque, NM 87102-3331

Richard Leverick
Attorney for Defendant
5120 San Francisco Rd NE
Albuquerque, NM 87109-4610

Office of the United States Trustee
PO Box 608
Albuquerque, NM 87103-0608

**Dill v. Brewer Oil Co., Adv. No. 11-1061-S**
**(In re Indian Capitol Distributing, Inc.), Case No. 7-09-11558-SA**
**Exhibit to Memorandum Opinion**

| | Fuel loaded | | Amount invoiced/ drafted | Oper acct initial draft | | Initial draft rejected | | Initial draft returned | | Draft cleared (paid) | | Wire transfer | | Days from billing to payment or unpaid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Day | Date | | Day | Date | Day | Date | Day | Date | Day | Date | Day | Date | |
| 1 | Mon | 2/23 | $57,123.06 4 loads | Tue | 2/24 | Wed | 2/25 | Thu | 2/26 | | | Fri | 2/27 | 3 |
| 2 | Wed Thu Fri Sat | 3/4 3/5 3/6 3/7 | $124,201.97 8 loads | Mon | 3/09 | Wed | 3/11 | Thu | 3/12 | | | Thu | 3/12 | 3 |
| 3 | Mon | 3/9 | $28,443.52 3 loads | Tue | 3/10 | Wed | 3/11 | Thu | 3/12 | | | | | 2 |
| 4 | Tue | 3/10 | $13,352.34 1 load | Tue | 3/10 | Wed | 3/11 | Thu | 3/12 | | | | | 2 |
| 5 | Tue | 3/10 | $15,492.95 1 load | Wed | 3/11 | Thu | 3/12 | | | Thu | 3/13 | | | 2 |
| 6 | Wed | 3/11 | $31,569.20 2 loads | Thu | 3/12 | Fri | 3/13 | | | Mon | 3/16 | | | 4 |
| 7 | Thu | 3/12 | $31,061.76 2 loads | Fri | 3/13 | Mon | 3/16 | | | Tue | 3/17 | | | 4 |
| 8 | Fri Sat | 3/13 3/14 | $44,518.77 3 loads | Mon | 3/16 | Tue | 3/17 | Wed | 3/18 | | | | | unpaid* |

| | Fuel loaded | | Amount invoiced/ drafted | Oper acct initial draft | | Initial draft rejected | | Initial draft returned | | Draft cleared (paid) | | Wire transfer | | Days from billing to payment or unpaid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Day | Date | | Day | Date | Day | Date | Day | Date | Day | Date | Day | Date | |
| 9 | Mon | 3/16 | $32,541.00 2 loads | Tue | 3/17 | Wed | 3/18 | Thu | 3/19 | | | | | unpaid* |
| 10 | Tue | 3/17 | $21,855.92 2 loads | Wed | 3/18 | Thu | 3/19 | | | Fri | 3/20 | | | 2 |
| 11 | Wed | 3/18 | $32,875.74 3 loads | Thu | 3/19 | Fri | 3/20 | | | Mon | 3/23 | | | 4 |
| 12 | Thu | 3/19 | $15,826.80 1 load | Fri | 3/20 | Mon | 3/23 | | | Tue | 3/24 | | | 4 |

* These two drafts, after being initially submitted and then returned on March 18 and 19 respectively (as shown on the chart), were resubmitted in their original full amounts. Both were then again rejected and returned on March 23 and 24 respectively. The two drafts were ultimately paid in part, by two partial drafts of $10,000 each, one on March 30 (T-4 at 42) and the other on April 1 (T-6 at 1), more than two weeks after they were first billed, resulting in a net loss of ([$44,518.77 + $32,541.00 =] $77,059.77 – $20,000 =) $57,059.77 to Brewer from the entire relationship.

–2–